IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| THERESA TAYLOR, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 20-834 |
| DON WAGNER, *in his official capacity as President of the Kansas City Board of Police Commissioners*, | ) |
| MARK TOLBERT, *in his official capacity as Vice President of the Kansas City Board of Police Commissioners*, | ) |
| CATHY DEAN, *in her official capacity as Treasurer of the Kansas City Board of Police Commissioners*, | ) |
| NATHAN GARRETT, *in his official capacity as Member of the Kansas City Board of Police Commissioners*, | ) |
| QUINTON LUCAS, *in his official capacity as Member of the Kansas City Board of Police Commissioners*, | ) |
| Defendants. | ) |

## COMPLAINT

1. While participating in non-violent protests on June 1, 2020, in Kansas City, Missouri, focused on issues of police brutality and racial injustice following the murder of George Floyd, Plaintiff Theresa Taylor was arrested, charged with ordinance violations, and, upon being released from jail, was given a verbal banishment order to not return to the Country Club Plaza ( the Plaza) or a protest or, if she did return, she would be arrested and held without bail.

1

2. In addition to Taylor, many others were similarly verbally threatened upon their release from police custody that they would be arrested and held without bail if they returned to a protest.

3. Taylor's municipal charges were subsequently dismissed, and there are no current charges pending against her related to the June 2020 protest. The verbal banishment order, however, has never been rescinded and remains in place.

4. Taylor fears participating in future protests near the Plaza and has not participated in any because she reasonably fears being arrested for violating the verbal banishment order to stay away or be subjected to arrest and held without bail.

5. Following her arrest on June 1, 2020, Taylor did not attend additional protests on the Plaza or elsewhere in the Kansas City metro area.

6. Had Taylor not been arrested and given the banishment order on June 1, 2020, she would have attended protests every day or night that she was available. Taylor even avoided protests in Overland Park, Kansas, for fear of arrest because of the treatment she received on June 1, 2020. She also avoided dropping off supplies at or near the Plaza for other protesters because she feared that she would be seen and then arrested pursuant to the banishment order.

7. In this civil-rights action, Taylor seeks injunctive relief against the Board of Police Commissioners (the Board), enjoining the Board from engaging in a policy, custom, or practice of requiring individuals arrested at non-violent protests in Kansas City to comply with unconstitutional banishment orders.

**PARTIES**

8. Taylor attended a protest in Kansas City, Missouri, in June 2020.

9. Defendant Don Wagner is President of the Kansas City Board of Police Commissioners. He is sued in his official capacity only.

10. Defendant Mark Tolbert is Vice President of the Kansas City Board of Police Commissioners. He is sued in his official capacity only.

11. Defendant Cathy Dean is Treasurer of the Kansas City Board of Police Commissioners. She is sued in her official capacity only.

12. Defendant Nathan Garrett is a Member of the Kansas City Board of Police Commissioners. He is sued in his official capacity only.

13. Defendant Quinton Lucas is a Member of the Kansas City Board of Police Commissioners. He is sued in his official capacity only.

## JURISDICTION AND VENUE

14. Taylor brings this claim pursuant to the Free Speech Clause of the First Amendment to the United States Constitution and the Due Process Clause of the Fourteenth Amendment, through 42 U.S.C. § 1983.

15. This Court has jurisdiction under 28 U.S.C. § 1331 as this claim "arises under the Constitution of the United States."

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Defendants are located in the City of Kansas City, Missouri, and the actions giving rise to the claims in this suit occurred in the City of Kansas City, Missouri.

17. Venue is proper in the Western Division of this Court pursuant to W.D. Mo. Local Rule 3.2(a)(1)(A).

## ALLEGATIONS

18. Following the murder of George Floyd by a police officer in Minneapolis, Minnesota, on May 25, 2020, protests against police brutality and racial injustice erupted throughout the nation, including in Kansas City.

19. Since then, hundreds of non-violent protesters, including Taylor, have been arrested and cited with misdemeanor ordinance violations.

20. Protests related to police brutality and racial injustice are ongoing throughout Kansas City and are planned to occur indefinitely.

21. Kansas City Mayor Quinton Lucas signed an Executive Order on Sunday, May 31, 2020, creating a curfew starting at 8:00 p.m. on May 31, 2020, and expiring at 6:00 a.m. on Monday, June 1, 2020. The curfew applied to the following geographic areas:

   a. Central Business District, as defined in Section 10-212(d)(2) in the Code of Municipal Ordinances, generally described as the area between the Missouri River on the north, Broadway on the west, Holmes on the east and Pershing Road on the south;
   b. Country Club Plaza Area, as defined in Section 10-212(d)(2) in the Code of Municipal Ordinances, generally described as the area between 46th Terrace on the north, Main Street on the east, Ward Parkway on the south and Belleview Avenue on the west;
   c. The Westport Shopping District Area, as defined in Section 10-212(d)(2) in the Code of Municipal Ordinances, generally described as the area between 39th Street on the north, Main Street on the east, 43rd Street on the South and Southwest Trafficway on the west.
   d. All Parks in the City of Kansas City, Missouri.

22. No further curfews were in place after it expired at 6:00 a.m. on June 1st.

23. Many protests related to racial injustice and police brutality have and will continue to occur in Kansas City; many of these protests will take place in and around the area commonly referred to as the Country Club Plaza (Plaza).

24. The location of a protest is often an important aspect of the message being conveyed by the protesters.

25. The design and development of the Plaza is credited to a man named Jesse Clyde (J.C.) Nichols. The Plaza's shopping and restaurant area was built and opened in 1923.

26. J.C. Nichols developed residential real estate in Kansas City as well as commercial real estate. He was the Director of the Kansas City Real Estate Board seven times and helped create the Federal Housing Administration.

27. As part of his residential developments, and particularly in his developments near the Plaza, J.C. Nichols included racist and anti-Semitic restrictive covenants prohibiting who could own or occupy the homes. These racist restrictive covenants automatically renewed, thereby ensuring redlining and segregation in Kansas City.

28. The residential housing that surrounds the Plaza is still owned and occupied predominately by wealthy white people.

29. It was not until the Supreme Court decided *Shelley v. Kraemer*, 334 U.S. 1 (1948), that these restrictive covenants became unenforceable.

30. In Kansas City, until very recently, a major parkway and one of the most iconic Kansas City fountains were named after J.C. Nichols.

31. On June 30, 2020, the Kansas City, Missouri, Department of Parks and Recreation voted unanimously to remove J.C. Nichols' name from both the fountain at Mill Creek Park as well as the street that borders the west side of the park. Mill Creek Park sits on the east side of

the Plaza. The parkway borders the park to the west and the fountain is a central focal point of the park (and the Plaza). Both the fountain and parkway are within the area commonly known as the Plaza.

32. The parkway is now known as Mill Creek Parkway, which was its original name from 1913 until 1952 when it was changed to J.C. Nichols Parkway.

33. The Memorial Fountain has not yet been renamed but discussions around renaming involve a recognition of the Rev. Martin Luther King Jr.

34. Many protests related to racial injustice and police brutality have occurred and will continue to occur in and around Mill Creek Park and on or near Mill Creek Parkway.

35. Taylor was arrested while participating in a non-violent protest on June 1, 2020.

36. Taylor parked in a nearby neighborhood and walked to the Plaza where the streets had been closed to vehicle traffic.

37. Taylor arrived at the Plaza in Kansas City around 5:30 p.m. on June 1, 2020.

38. On June 1, 2020, Taylor observed protesters chanting (e.g., "I can't breathe"), raising fists (a very common form of expression at protests), holding signs, and marching peacefully. She did not observe any violence by protesters.

39. After standing with protesters on the Plaza for about 30 minutes, Taylor joined a group of approximately 100 protesters marching north on Main Street toward downtown.

40. The group marching north was led by a minister who encouraged the protesters in the group to remain peaceful the entire time.

41. A police car was ahead of the marching protesters and did not tell the protesters to stop marching.

42. The group would periodically stop marching to kneel down and listen to someone speak before continuing on.

43. The group continued marching heading north on various streets, seeing police officers stationed at two locations along the march route, until it reached a police barricade at 31st and Main Street.

44. The protesters went back south to avoid this police barricade and headed west on Linwood Boulevard toward Broadway Boulevard before reaching another police barricade at 31st and Broadway.

45. The protesters stopped marching approximately a block south of the police barricade.

46. At this time, the police thanked the protesters for remaining peaceful during their march.

47. A portion of the group headed back toward the Plaza. Taylor remained for approximately 15 minutes with another portion of the group and stood on a sidewalk.

48. The police began to threaten to arrest protesters who refused to leave the area.

49. The officers proceeded in unison and approached the remaining group of protesters while banging their shields with their batons.

50. Taylor then joined a group of 10-15 protesters heading away from the area pursuant to the dispersal order and walked toward her car, which was parked at 45th Street and Madison Avenue.

51. The march had stopped at this point and Taylor and the others were peacefully dispersing from the area.

52. As Taylor and the other departing protesters headed south and reached 39th Street and Pennsylvania where they saw a police line barricading the street to the west of Pennsylvania across 39th Street; they then turned east to continue walking on 39th Street toward their cars.

53. Out of nowhere, the police officers who had been stationed across 39th Street rushed at them and started arresting protesters.

54. At the time of her arrest, Taylor had been walking peacefully on the sidewalk back to her car and entering the street only to cross it while walking, in compliance with the dispersal order, for about 15 minutes.

55. The police shouted at Taylor to "get on the fucking ground" and put her hands behind her back. She did as she was told and the police zip-tied her hands behind her.

56. She was then ordered to sit against a wall with her legs out and crossed.

57. Taylor's mask was taken at the time of her arrest and placed in a bag of her belongings.

58. Taylor was first placed into the transport vehicle—without her mask—along with three other protesters and then in a police van with seven other protesters. She did not observe a single officer wearing a mask.

59. Taylor and the other protesters in the transport van were taken to East Patrol where they were held.

60. None of the police officers would tell Taylor or the others why they were being arrested or where they would be taken.

61. Many officers were equipped with military gear, sniper rifles, tear gas, and rubber bullets as they faced non-violent protesters, like Taylor, on June 1, 2020.

62. Taylor and the others were taunted by police who said, "why are you throwing your life away?" and "what does that sign even mean, can you explain it to me?"

63. Taylor and others were told by police officers that they were "stupid" for attending the protest, and their signs were mocked.

64. Taylor observed police officers smiling, laughing, and swapping stories of their arrests of protesters, as if each arrest was a trophy. Taylor heard an officer say: "I got mine, did you get yours?"

65. While she and the other protesters sat in holding cells after being transported to East Patrol, the officers played with what appeared to be tasers and pretended to handcuff one another.

66. Taylor heard a protester get slapped by an officer and then saw the protester get attacked after while she lay on the ground after doing nothing to provoke or harm that officer.

67. The arrested protesters were taken to a parking lot approximately five minutes away that was full of police cars. There, they were unloaded and reloaded into another police vehicle and driven to East Patrol.

68. At East Patrol, Taylor and the other arrested protesters with her were processed and placed in a cell. Taylor was in a cell with about 7 other protesters where she remained for several hours.

69. The individual who had been slapped by an officer was told her bond would be $2000 or $3000 because she had allegedly fought with the police. Taylor observed this protester's interaction with the police and saw no fighting whatsoever.

70. While in the cell, Taylor and others were again taunted by police.

9

71. One officer asked the detained protesters had they "ever seen animal planet" because they looked "like meerkats peering out" of their cells. Another officer said, when a protester was using the telephone: "your mommy doesn't want to bail you out of jail. Hang up."

72. The officers' comments were not only insulting, rude, and entirely inappropriate, but they made Taylor and the others feel very uncomfortable.

73. The arrested protesters were all told that there would be no signature bond and that they had to pay $1000 or pay a bondsman.

74. This bail amount was set before Taylor ever saw a judge, and without any apparent consideration for whether Taylor would reliably return to court for appearances and trial.

75. Taylor was bonded out between 3:45 and 4:15 a.m. on June 2, 2020.

76. Taylor was never told what she was being charged with, but her ticket indicates a citation under Kansas City Ordinance § 70-73 for failing to comply with the lawful order of a police officer with the authority to direct, control, or regulate traffic. Specifically, her ticket indicates that she "did fail to disperse or move out of street after being ordered to do so by officer."

77. Taylor's bond paperwork included the following requirements and conditions:

**Bond**

The undersigned as principal and surety agree to pay the State of Missouri the sum of $1,000.00 unless the defendant abides by the conditions set out below.

**Bond conditions and consequences for failure to meet conditions:**
Having been charged with/convicted of the ordinance violation(s) shown above, the defendant has posted this bond to be released from law enforcement custody.

**The defendant is required to and agrees to:**
1. Attend all court hearings as seet by this court or any court to which this case is transferred or appealed.
2. Submit to any orders, judgments and sentence of this court or any court hearing this case.
3. Inform the court of any change of address.
4. Other Conditions
    a. Defendant shall not tamper with a witness or victim nor allow another person to tamper with a witness or victim on behalf of the defendant as described on the reverse of this form.
    b. Obey all laws
    c. _____.

78. Upon leaving East Patrol after posting bond, Taylor was also commanded verbally by a law enforcement officer that she could not return to the Plaza, and that if she did, she would be arrested and held without bail.

79. This banishment order was told to Taylor and other protesters verbally by the police officers.

80. Taylor did not attend a protest or drop off supplies to protesters after her arrest because of the order not to return to the Plaza and the policy or custom of being told that she would be arrested and held without bail if she did return. Had she not been arrested and received the banishment order on June 1, 2020, Taylor would have continued to attend protests on any day or night she was available. Taylor also avoided attending protests in Overland Park, Kansas, for fear of arrest there.

81. Taylor would like to attend protests in Kansas City in the future but will not do so if the banishment order has not been rescinded because she continues to fear being arrested.

82. Taylor understood the banishment order to mean, at a minimum, that she could never attend another protest on the Plaza; however, because the officer ordered her not to return

11

to the Plaza generally, she also fears arrest for ever visiting the Plaza at all, even unrelated to a protest.

83. For example, Taylor fears arrest for going to the Plaza to get a cup of coffee at a local coffee shop or pick up takeout at a local restaurant—things she would not hesitate to do if not for the banishment order as some of her favorite places to go are on the Plaza and some of her close friends live in the area of the Plaza.

84. Taylor understands the banishment order to mean that if she is ever seen at a protest on the Plaza again, she will be arrested and held without bail. She believes that she is forbidden to attend any protest on the Plaza, ever, no matter what the issue or form of the protest.

85. Taylor has returned to the Plaza only twice during the day since her June 1, 2020 arrest and banishment order to pick up some store items for her best friend's wedding. Had it not been for the need to return to pick up these items for the wedding, Taylor would not have returned to the Plaza because of the banishment order.

86. Taylor believes this order to be perpetual.

87. Taylor's banishment order did not have a termination date and is therefore perpetual and still in effect.

88. The Plaza is inconsistently defined in Kansas City ordinances.

89. The "Country Club Plaza" is defined by Kansas City Ordinance § 80-810-395 as:

> The area of the city included within the following general boundaries: Summit Street, Jefferson Street, and Pennsylvania Avenue on the west; W 47th Street, W 46th Street, and W 46th Terrace on the north; Broadway, Wyandotte Street, and JC Nichols Parkway on the east; and Ward Parkway on the south and more specifically portrayed by Exhibit A:



90. "Country Club Plaza" is also defined in Kansas City Ordinance § 10-212(d)(3) as: "the area generally described as the area between 46th Terrace on the north, Main Street on the east, Ward Parkway on the south and Belleview Avenue on the west." This same definition is found in Kansas City Ordinance § 10-215(a)(8).

91. In a third variation of the definition, Kansas City Ordinance § 76-266(o) defines the area "commonly known as Country Club Plaza" as "the area bound by W. 47th Street on the north, eastbound Ward Parkway on the south, J.C. Nichols Parkway on the east, and Roanoke Road on the west . . . ."

13

92. In a fourth variation, Kansas City Ordinance § 50-8.5(6) defines the "Country Club plaza area" as "generally described as the area between 46th Terrace on the north, J.C. Nichols Parkway on the east, Ward Parkway on the south and Jefferson on the east." This provision states further that "[t]he Country Club plaza area includes the public areas on both sides of the named boundaries." *Id.* This same definition is found in Kansas City Ordinance § 50-238(a)(3).

93. The "Country Club Plaza" is commonly referred to as "the Plaza."

94. Protesters who were given the verbal banishment order not to return to the Plaza, including Taylor, were not told what geographic area that entailed and were provided no specific boundaries for this verbal condition of release.

95. The meaning of "the Plaza" is vague and ambiguous such that it would cause a reasonable person to steer far wider than necessary to ensure that they do not get caught at "the Plaza" as that term was used in writing or verbally by law enforcement.

96. The Plaza is an area in Kansas City that includes businesses, restaurants, stores, and churches.

97. The banishment order did not specifically limit impermissible purposes for returning to the Plaza; returning for any purpose was forbidden by the order.

## COUNT I
*42 U.S.C. § 1983 – First Amendment*

98. Taylor incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

99. Taylor engaged in constitutionally protected expressive activity when she gathered with other protesters on public streets and sidewalks in and around the Plaza to express her support for ending police brutality and racial injustice in Kansas City.

14

100. Ordering Taylor verbally that she is forbidden from returning to the Plaza and risks arrest and incarceration without bail if she disobeys is an adverse action that was motivated by Taylor's constitutionally protected expressive activity.

101. Ordering Taylor verbally that she is forbidden from returning to the Plaza and risks arrest and incarceration without bail if she disobeys is an act that would chill a person of ordinary firmness from continuing to engage in a constitutionally protected activity—namely, returning to the Plaza, a place of profound symbolic import, to protest racial inequality and police brutality.

102. The government may not suppress lawful speech as the means to suppress unlawful speech.

103. This blanket prohibition sweeps broadly to bar not only illegal acts but also a substantial amount of constitutionally protected expressive conduct.

104. Ordering Taylor and other protesters verbally that they are forbidden from returning to the Plaza is a custom or policy of the City of Kansas City and the Board of Police Commissioners that suppressed her constitutionally protected expressive activity; there was no strong enough government interest to justify it; and it was not appropriately tailored to whatever interest the government claims it had in imposing such a speech-suppressing burden.

105. It was the custom and policy of the City of Kansas City and the Board of Police Commissioners that caused the First Amendment violations against Taylor.

106. Following the arrest and banishment order, Taylor filed a complaint with the Kansas City Police Department on June 8, 2020. She was interviewed over the telephone on July 9, 2020, but there has been no resolution of her complaint that she is aware of and she has not yet

received any documents or recordings, although they have been requested by her, related to the complaint or interview.

## COUNT II
*42 U.S.C. § 1983 – Fourteenth Amendment*

107. Taylor incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

108. The United States Constitution protects a fundamental right to travel.

109. The custom and policy of the City of Kansas City and the Board of Police Commissioners does not promote a compelling state interest when it bars Plaintiff from returning to the Plaza.

110. Taylor, who is from the greater Kansas City metropolitan area, has avoided the Plaza—the heart of Kansas City and a place of great symbolic import to ongoing protests against police brutality and racial inequity—because of the banishment order she was given following her arrest.

111. Thereby, Defendants have violated her fundamental right to travel.

112. Furthermore, Taylor has been deprived of a liberty interest without sufficient notice or an opportunity to be heard and without a decision by any neutral decisionmaker.

113. Taylor was not informed that the banishment order was a condition of arrest, charge, or bond, nor how long it would last, what purposes it would cover, or even what the boundaries of the prohibition are or were.

114. Taylor has had no opportunity to be heard as to why she should not be barred from the Plaza.

115. In addition, "do not return to the Plaza" is vague and ambiguous and does not put Taylor—or any reasonable person—on fair notice of where she is prohibited from going or for how long.

116. Because Taylor was instructed verbally not to return to the Plaza without any time or purpose limitation, Plaintiff reasonably fears that the prohibition is indefinite and applies at all times.

117. Furthermore, regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up.

118. The banishment order forbidding Taylor from returning to the Plaza and risking arrest and incarceration without bail if she disobeys is an unconstitutional, coercive condition that has burdened Taylor's enumerated constitutional rights under the First and Fourteenth Amendments.

119. The custom and policy of the City of Kansas City and the Board of Police Commissioners caused these deprivations of Taylor's rights under the First and Fourteenth Amendments.

## PRAYER FOR RELIEF

WHEREFORE, Taylor prays this Court:

A. Grant a preliminary injunction upon motion and a permanent injunction preventing unconstitutional banishment orders from being imposed upon non-violent protesters;

B. Enter a declaration that the banishment order is unconstitutional on its face or as applied to Taylor;

C. Award Taylor nominal damages;

D. Award Taylor costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

E. Allow such other and further relief as this Court finds just and proper under the circumstances.

Respectfully submitted,

*/s/ Anthony E. Rothert*
Anthony E. Rothert, #44827
Jessie Steffan, #64861
Kayla DeLoach, #72424
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114
Fax: (314) 652-3112
trothert@aclu-mo.org
jsteffan@aclu-mo.org
kdeloach@aclu-mo.org

Gillian R. Wilcox, #61278
ACLU of Missouri Foundation
406 West 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9933
gwilcox@aclu-mo.org

Amy E. Breihan, #65499
W. Patrick Mobley, #63636
Roderick & Solange MacArthur Justice Center
3115 South Grand Boulevard, Suite 300
St. Louis, MO 63118
Phone: (314) 254-8540
amy.breihan@macarthurjustice.org
pat.mobley@macarthurjustice.org